IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-02548-KLM

THE ESTATE OF JUSTIN MATTHEW STIEB,

    Plaintiff,

v.

DEBORAH JOHNSON,
LOTTIE DOMINGUEZ, Deputy,
J. RIVERA, Deputy,
JOE MCNUTT, Sergeant,
WILLIAM HUNTER, Deputy,
SAMUEL DEAN MARTIN, Deputy,
DANIEL CANO, Sergeant, and
CHRIS R. WELDON, Captain,

    Defendants.

_____

**ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

    This matter is before the Court on Defendants' **Motion for Summary Judgment**

[#64][1] ("Defendants' Motion"), and on Plaintiff's **Motion for Summary Judgment** [#67]

("Plaintiff's Motion").  Plaintiff filed a Response [#76] in opposition to Defendants' Motion,

and Defendants filed a Reply [#85].  Defendants filed a Response [#79] in opposition to

Plaintiff's Motion, and Plaintiff filed a Reply [#87].  The Court has reviewed the Motions,

Responses, Replies, the entire case file, and the applicable law, and is sufficiently advised

---

[1]  "[#64]" is an example of the convention the Court uses to identify the docket number
assigned to a specific paper by the Court's case management and electronic case filing system
(CM/ECF).  This convention is used throughout this Order.

-1-

in the premises.[2]  For the reasons set forth below, Defendants' Motion [#64] is **GRANTED in part and DENIED in part** and Plaintiff's Motion [#67] is **GRANTED in part and DENIED in part**.

## I. Background[3]

On August 16, 2014, Justin Stieb ("Stieb") died in the Delta County Detention Center ("Detention Center") while serving a criminal sentence.  *Defs. Motion* [#64] at 5; *Pl. Motion* [#67] at 5.  Mr. Stieb had a history of seizures which had started at the age of 16, and Delta County Work Release Center ("Work Release") staff and Detention Center staff were aware of this health issue.  *Defs. Motion* [#64] at 1; *Pl. Motion* [#67] at 1.  Mr. Stieb also had heart problems.  *Defs. Motion* [#64] at 11; *Pl. Motion* [#67] at 2.

On August 16, Mr. Stieb had multiple health "events."[4]  At 2:05 a.m., Mr. Stieb had what appeared to Mr. Stieb and to Work Release staff to be a seizure.  *Defs. Motion* [#64]; *Pl. Response* [#76] at 1 ¶ 6.  At 4:39 a.m., Mr. Stieb had another event which appeared to himself and to staff to be another seizure.  *Defs. Motion* [#64] at 2; *Pl. Response* [#76] at

---

[2]  This case has been referred to the undersigned for all purposes pursuant to D.C.COLO.LCivR 40.1(c) and 28 U.S.C. § 636(c), on consent of the parties.  See [#29].

[3]  Because this Order addresses cross-motions for summary judgment, only undisputed facts are included in the Background.  *See Boyz Sanitation Serv., Inc. v. City of Rawlins, Wyo.*, 889 F.3d 1189, 1195 (10th Cir. 2018) ("Where, as here, we are presented with cross-motions for summary judgment, we must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor."); *see also Jacklovich v. Simmons*, 392 F.3d 420, 425 (10th Cir. 2004) ("On cross-motions for summary judgment, . . . we must view the inferences to be drawn from affidavits, attached exhibits and depositions in the light most favorable to the party that did not prevail."); *see also Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007) ("Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").  To the extent material, disputed facts are addressed in the Analysis section below.

[4]  Defendants dispute that Mr. Stieb was experiencing epileptic seizures on August 16, 2014.  Accordingly, the Court primarily uses the term "events" throughout this Order.

1 ¶ 6.  After the second event, Mr. Stieb was transported to the emergency room at Delta Memorial Hospital.  *Defs. Motion* [#64] at 2; *Pl. Motion* [#67] at 2.  Mr. Stieb was not admitted to the hospital and was discharged around 6:40 a.m.  *Defs. Motion* [#64] at 3; *Pl. Motion* [#67] at 3.  During the hospital visit, Mr. Stieb was directed to take 300 mg of Dilantin when he was returned to detention.  *Defs. Motion* [#64] at 3; *Pl. Response* [#76] at 2 ¶ 8.

After leaving the hospital, Mr. Stieb was transported to the Detention Center.  *Defs. Motion* [#64] at 3; *Pl. Motion* [#67] at 3.  At approximately 10:30 a.m., Mr. Stieb suffered another health event which Detention Center staff believed was a third seizure.  *Defs. Motion* [#64] at 4; *Pl. Motion* [#67] at 3.  It is undisputed that *if* Mr. Stieb received his 300 mg of Dilantin, it was not dispensed by Defendant Deborah Johnson ("Johnson"), a nurse, to Mr. Stieb until approximately 11:30 a.m., after he had suffered this third event.[5]  *Defs. Motion* [#64] 3; *Pl. Motion* [#67] at 3.

Not long after the third event, Mr. Stieb was placed in an "at-risk" cell with padded walls and video monitoring.  *Def. Motion* [#64] at 4; *Pl. Motion* [#67] at 3.  Around 3:25 p.m., Mr. Stieb was observed lying on his side moving his limbs.  *Defs. Motion* [#64] at 4; *Pl. Response* [#76] at 4-5 ¶ 23.  Defendants J. Rivera ("Rivera") and Lottie Dominguez ("Dominguez"), both deputies, checked on Mr. Stieb around 3:48 p.m.  *Defs. Motion* [#64] at 4; *Pl. Response* [#76] at 6 ¶ 29.  They tried to use a defibrillator, but it "malfunctioned" and provided instruction to begin chest compressions.  *Defs. Motion* [#64] at 5; *Pl. Response* [#76] at 6 ¶ 31.  They did not administer any chest compressions.  *Defs. Motion*

---

[5] To be clear, Plaintiff disputes whether the Dilantin was administered at all.  *Pl. Response* [#76] at 9.

[#64] at 5; *Pl. Response* [#76] at 6 ¶ 31.  Someone called 9-1-1 for an ambulance which arrived shortly thereafter.[6]  *Defs. Motion* [#64] at 5; *Pl. Motion* [#67] at 5.  At approximately 4:07 p.m., Mr. Stieb was pronounced dead.  *Defs. Motion* [#64] at 5; *Pl. Motion* [#67] at 5.

An autopsy was conducted by Michael J. Benziger, M.D. ("Benziger").  *Defs. Motion* [#64] at 5; *Pl. Motion* [#67] at 12-13.  It is undisputed that Mr. Stieb died of an acute cardiac event and that leading up to his death, he suffered from severe biventricular dilatory cardiomyopathy, which is a chronic condition.  *Defs. Motion* [#64] at 5; *Pl. Motion* [#67] at 13.

On the evening of August 16, individuals from the Sheriff's Office went to the residence of Mr. Stieb's mother, Toni Benevento ("Benevento"), and wife, Tamara Knob ("Knob"), to notify them of Mr. Stieb's death.  *Defs. Motion* [#64] at 19; *Pl. Response* [#76] at 19.  On August 19, 2014, the *Montrose Daily Press* published a newspaper article relating to Mr. Stieb's death.  *Defs. Motion* [#64] at 20; *Pl. Response* [#19] at 21.  The article stated that initial information indicated Mr. Stieb died of natural causes and that the investigation was ongoing.  *Defs. Motion* [#64] at 20; *Pl. Response* [#19] at 21.  About a month after Mr. Stieb's death, the Sheriff's Office was contacted by Attorney David Lane ("Lane") of Killmer, Lane & Newman, LLP ("Killmer Lane"), regarding Mr. Stieb's potential legal claims arising from his death.  *Defs. Motion* [#64] at 20; *Pl. Response* [#76] at 19.  Ms. Benevento and Ms. Knob did not begin inquiring into potential constitutional violations relating to Mr. Stieb's death until May 2015, when Mr. Lane contacted them.  *Defs.*

---

[6]  Although the parties do not explicitly state this as an undisputed fact, it appears that Defendant Joe McNutt ("McNutt") made the call and then recorded his action in the jail event-logging system.  *See Pl.'s Ex. C, Delta County Jail Events Summary Report* [#68-3] at 11.

*Response* [#79] at 22; *Pl. Reply* [#87] at 7-8.

Plaintiff, the Estate of Mr. Stieb, filed this lawsuit on October 12, 2016. *See generally Compl.* [#1]. In the Complaint [#1], Plaintiff asserts (1) an Eighth Amendment claim for "Delay in Access to Medical Care Causing Death" and (2) an Eighth Amendment claim for "Denial and Lack of Treatment in Sub Standard Medical Care Causing Death." *Id.* ¶¶ 126-55. Plaintiff generally seeks damages, attorneys' fees, costs, and other monetary relief. *Id.* at 21-22.

## II. Standard of Review

The purpose of a motion for summary judgment pursuant to Fed. R. Civ. P. 56 is to assess whether trial is necessary. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Pursuant to Fed. R. Civ. P. 56(a), summary judgment should be entered if the pleadings, the discovery, any affidavits, and disclosures on file show "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the case under the governing substantive law. *Id.*

The burden is on the movant to show the absence of a genuine issue of material fact. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 323). When the movant does not bear the ultimate burden of persuasion at trial, the "movant may make its prima facie demonstration [of the absence of a genuine issue of material fact] simply by pointing out to the [C]ourt a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.* at 671. If the movant

carries the initial burden of making a prima facie showing of a lack of evidence, the burden

shifts to the nonmovant to put forth sufficient evidence for each essential element of his

claim such that a reasonable jury could find in his favor. *See Anderson*, 477 U.S. at 248.

The nonmovant must go beyond the allegations and denials of his pleadings and provide

admissible evidence, which the Court views in the light most favorable to him. *Adickes v.*

*S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Panis v. Mission Hills Bank, N.A.*, 60 F.3d

1486, 1490 (10th Cir. 1995) (citing *Celotex*, 477 U.S. at 324). Conclusory statements

based merely on conjecture, speculation, or subjective belief are not competent summary

judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). The

nonmoving party's evidence must be more than "mere reargument of [his] case or a denial

of an opponent's allegation" or it will be disregarded. *See* 10B Charles Alan Wright et al.,

*Federal Practice and Procedure* § 2738 (4th ed. 2017).

Only documents that meet the evidentiary requirements of Fed. R. Civ. P. 56 may

be considered for purposes of summary judgment. Rule 56(c) provides that:

> (1) A party asserting that a fact cannot be or is genuinely disputed must
> support the assertion by:
>> (A) citing to particular parts of materials in the record, including
>> depositions, documents, electronically stored information, affidavits or
>> declarations, stipulations (including those made for purposes of the
>> motion only), admissions, interrogatory answers, or other materials[.]
>> . . .
> (3) Materials Not Cited. The court need consider only the cited materials, but
> it may consider other materials in the record.
> (4) Affidavits or Declarations. An affidavit or declaration used to support or
> oppose a motion must be made on personal knowledge, set out facts that
> would be admissible in evidence, and show that the affiant or declarant is
> competent to testify on the matters stated.

Fed. R. Civ. P. 56(c)(1)-(4).

### III. Analysis

**A.     Statute of Limitations**

Of preliminary importance is whether the statute of limitations bars this suit. "Generally, a limitation defense is an affirmative defense and the burden of proof is on the party asserting it." *Larson v. Snow College*, 115 F. Supp. 2d 1286, 1292 (D. Utah 2000) (citing *Goldsmith v. Learjet Inc.*, 90 F.3d 1490 (10th Cir. 1996)).  In general, a statute of limitations issue is a mixed question of fact and law; however, "[i]f the relevant facts are *undisputed*, the statute of limitations is a question of law appropriate for summary judgment." *Standards Governing Summ. J.*, Rutter Grp. Prac. Guide Fed. Civ. Proc. Before Trial (Nat'l Ed.) Ch. 14-F.  "[I]n the federal courts, cases involving defenses hinging on applicable statutes of limitations *may* lend themselves to summary judgment . . . . [T]he cases firmly hold that if the statute of limitations depends on disputed facts, then summary judgment is inappropriate." *Wolf v. Preferred Risk life Ins. Co.*, 728 F.2d 1304, 1306 (10th Cir. 1984) (citing *State of Ohio v. Peterson*, 585 F.2d 454, 457 (10th Cir. 1978)) (emphasis added).  Thus, there must be no disputed material facts for either Defendants' Motion [#64] or Plaintiff's Motion [#67] to succeed on this issue.

The statute of limitations for § 1983 cases arising in Colorado is two years.  *See* Colo. Rev. Stat. § 13-80-102(1)(g); *see also Indus. Constructors Corp. v. U.S. Bureau of Reclamation*, 15 F.3d 963, 968 (10th Cir. 1994) (holding that an action brought pursuant to 42 U.S.C. § 1983 is subject to the statute of limitations in the state where the action arose).  Mr. Stieb died on August 16, 2014.  *Defs. Motion* [#64] at 5; *Pl. Motion* [#67] at 5. The present action was not filed until October 12, 2016, approximately two years and two months after Mr. Stieb's passing.  *See Compl.* [#1].  Defendants contend that the action accrued at or near Mr. Stieb's death, and, consequently, Plaintiff did not timely file this

lawsuit.

### 1.    Standard for Determining Accrual Date

The date when a cause of action accrues is determined by federal law.  *Baker v. Bd. of Regents of the State of Kan.*, 991 F.2d 628, 632 (10th Cir. 1993).  For § 1983 cases, the "action accrues when 'facts that would support a cause of action are or should be apparent.'"  *Fratus v. DeLand*, 49 F.3d 673, 675 (10th Cir. 1995) (quoting *Blumberg v. HCA Mgmt. Co.*, 848 F.2d 642, 645 (5th Cir. 1998)).  That is, the action accrues "when the Plaintiff knows or should know that his or her constitutional rights have been violated."  *Smith v. City of Enid*, 149 F.3d 1151, 1154 (10th Cir. 1998).  That test is objective, and the action accrues when "a reasonable person [would be put] on notice that wrongful conduct caused the harm."  *Alexander v. Okla.*, 382 F.3d 1206, 1216 (10th Cir. 2004).  "[A] plaintiff is on inquiry notice whenever circumstances exist that would lead a reasonable [plaintiff] of ordinary intelligence, through the exercise of reasonable due diligence, to discover his or her injury."  *Robert L. Kroenlein Trust ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1280 (2014) (citing *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 251 (2001)).  "It is not necessary that a claimant know all of the evidence ultimately relied on for the cause of action to accrue."  *Baker*, 991 F.2d at 632.  Defendants bear the burden of proof on the question of when the action accrued.  *See Beidleman, v. Random House, Inc.*, 621 F. Supp. 2d 1130, 1134 (D. Colo. 2008).

### 2.    Defendants' Motion [#64]

Because Defendants bear the burden of proof on this issue, they must show the absence of a genuine issue of material fact such that a reasonable jury could only conclude

that the statute of limitations has run. *Adler*, 144 F.3d at 670-671 (citing *Celotex*, 477 U.S. at 323). Defendants contend that "a reasonable person using reasonable diligence would have been put on notice at or near Mr. Stieb's death [so that] . . . this lawsuit was not timely commenced." *Def. Motion* [#64] at 19. Plaintiff counters that neither Ms. Benevento nor Ms. Knob was put on notice that wrongful conduct may have caused Mr. Stieb's death until May 2015, when Mr. Lane contacted them. *Pl. Reply* [#87] at 7-8.

When evaluating Defendants' Motion [#64], the Court must view the evidence in a light most favorable to Plaintiff. *Adickes*, 398 U.S. at 157. Ms. Benevento and Ms. Knob knew that Mr. Stieb had health problems, including seizures, and they reasonably believed that Mr. Stieb died as a result. *See Aff. of Benevento* [#68-6] ¶ 6. As Plaintiff points out, the evidence shows that many sources reported that Mr. Stieb died of natural causes: "the Coroner's Report stated Mr. Stieb died of natural causes, . . . the . . . Certificate of Death confirmed Mr. Stieb died of natural causes, . . . the . . . original Autopsy Report confirmed Mr. Stieb died of natural causes, and the Colorado Bureau of Investigations determined their investigation into the death of [Mr.] Stieb [did] not involve criminal violations." *Pl. Motion* [#67] at 22. Multiple statements that Mr. Stieb died of natural causes cannot be construed as evidence of a fact "that would suggest to a reasonable person that he [had] been injured." *Kirchhefer*, 764 F.3d at 1280. Unlike the estate plaintiff in *Dorrough v. Corey*, No. CIV-15-143-D, 2016 WL 3829143 (W.D. Okla. July 12, 2016), where the deceased died after his cell mate attacked him, there is no evidence that Plaintiff had knowledge of facts that would put it on notice of a constitutional violation at the time of Mr. Stieb's death.

Furthermore, unlike the plaintiffs in *Kirchhefer* and *Dorrough*, Plaintiff is not arguing

that it waited until it knew more *details* about the "injury;" rather, Plaintiff's point is that it did not know a constitutional "injury" had occurred at all. *See Kirchhefer*, 764 F.3d at 1278; *see also Dorrough*, 2016 WL 3829143, at *4 (stating that the plaintiff's "knowledge that [the deceased] died as a result of an attack by his cell mate . . . put her on notice of the harm—that prison officials had failed to protect [the deceased]"); *see also Aff. of Benevento* [#68-6] ¶ 27 (stating that Ms. Benevento, through her life experiences, has "come to believe that sometimes people just die, and it's not anybody's fault").

Accordingly, because a reasonable jury could conclude that a reasonable person would not be on notice of constitutional violations on or near the date of Mr. Stieb's death, Defendants have not satisfied their Rule 56 burden to show an absence of a genuine issue of material fact regarding satisfaction of the statute of limitations, and Defendants' Motion [#64] is therefore **denied** with respect to this issue.

### 3. Plaintiff's Motion [#67]

Plaintiff, on the other hand, has shown that a reasonable person would not have been put on "notice that wrongful conduct caused" Mr. Stieb's death until about May 2015. *See Alexander*, 382 F.3d at 1216.

As previously noted, Plaintiff does not bear the ultimate burden at trial on this issue. *See Larson*, 115 F. Supp. 2d at 1292. As a movant for summary judgment, if Plaintiff shows "a lack of evidence for the nonmovant[s]," i.e., Defendants, *see Adler*, 144 F.3d at 671, the burden then shifts to Defendants to put forth sufficient evidence such that a reasonable jury could find in their favor. *See Anderson*, 477 U.S. at 248. When evaluating Plaintiff's Motion [#67], the Court must view the evidence in a light most favorable to

Defendants. *See Adickes*, 398 U.S. at 157.

Defendants point to the fact that Ms. Benevento stated in her deposition that the officers who came to her residence on August 16, 2014 said that "they didn't know" what happened to her son. *Defs. Motion* [#64] at 19 (citing *Benevento 12-19-17 Dep. Excerpts* [#65-4][7]). This lack of explanation, Defendants argue, would put a reasonable person on notice to "inquire further as to the circumstances." *Id.* at 20. Defendants also emphasize that Ms. Benevento's affidavit "contradicts" her deposition because in her affidavit, Ms. Benevento claims that during the August 16 house visit, the officers told her that Mr. Stieb died of natural causes. *Defs. Response* [#79] at 21.

As a preliminary matter, the Court notes that alleged statements by officers that they "didn't know" "what happened" and that Mr. Stieb "died of natural causes" which were unidentified at the time are not mutually exclusive; that is, the affidavit and the deposition do not necessarily contradict one another. *See Def. Response* [#79] at 21; *see also Exhibit PP* [#80-15] at 4; *see also Aff. of Benevento* [#68-6] at 2 ¶ 13. More importantly, the fact that Ms. Benevento was told that the officers "didn't know" what happened is vastly different from her learning of circumstances that would put her *on notice* of potential constitutional violations. *See Kirchhefer*, 764 F.3d at 1280. The Tenth Circuit held elsewhere that a plaintiffs' contention that a claim accrued in 2008 was unpersuasive "because the record indicates the [plaintiffs] knew of the individual defendants' unlawful actions no later than 2004 and were therefore on notice that their constitutional rights may have been violated." *Mercer-Smith v. NM Children, Youth & Families Dept.*, 416 F. App'x 704, 710-711 (10th Cir.

---

[7] The Court notes that [#65-4] is missing the very quote on which Defendants so heavily rely. However, it can be found in Exhibit PP [#80-15].

2011).  Here, there are no facts in the record which indicate that Plaintiff had sufficient knowledge to suspect possible unlawful action by Defendants on August 16.  Regardless of whether Ms. Benevento was told that the officers "didn't know" the cause of Mr. Stieb's death or whether she was told that he died of unidentified natural causes, that factual dispute is not material to the determination of when the claim accrued.  *See Anderson*, 477 U.S. at 248 (stating that a fact is material if it might affect the outcome of the case under the governing substantive law).

The same reasoning applies to Defendants' next argument, that the *Montrose Daily Press* article put Plaintiff on notice of some unstated constitutional violation because it reported that "the investigation into Stieb's death has not concluded."  *Montrose Daily Press 8-19-14 Article* [#65-23] at 1.  However, a person of "ordinary intelligence" might well conclude that such an investigation is routine in jail deaths.  Moreover, there is no further evidence that this statement put Mr. Stieb's relatives on notice of potential constitutional violations.  *See Kirchhefer*, 764 F.3d at 1280.

Defendants' final argument, that Mr. Lane's contact with the Sheriff's office in September 2014 shows that a reasonable person knew or should have known of facts that would put her on notice that wrongful conduct may have caused the harm, also fails.  *Defs. Response* [#79] at 22.  Mr. Lane's law firm, Killmer Lane, never represented Plaintiff or Mr. Stieb's kin.  *Decl. of Lane* [#77-21] ¶¶ 13-15.  In his affidavit, Mr. Lane swears that the Colorado Open Records Act ("CORA") request sent by Killmer Lane to the Sheriff's office in September 2014 simply "sought records in order to attempt to come to a conclusion regarding" whether "there was or was not a civil rights violation resulting in death."  *Decl. of Lane* [#77-21] ¶¶ 5, 7.  Killmer Lane is in the business of litigating these types of actions,

and Mr. Lane's affidavit indicates that even his firm was unable to determine when he made the CORA request whether a possible constitutional violation had occurred. *See id.* The Court also notes that the mere fact that an attorney was inquiring into the circumstances of Mr. Stieb's death is not determinative of whether "'facts that would support a cause of action [were] or should [have] be[en] apparent,'" *Fratus*, 49 F.3d at 675 (quoting *Blumberg*, 848 F.2d at 645), or that "[P]laintiff kn[ew] or should [have] know[n] that [its] constitutional rights ha[d] been violated," *Smith*, 149 F.3d at 1154, or that Plaintiff was "on notice that wrongful conduct caused the harm," *Alexander*, 382 F.3d at 1216. As such, Defendants have not shown that a reasonable person of "ordinary intelligence" would have been on notice of a constitutional violation on or near August 16, 2014. *See Kirchhefer*, 764 F.3d at 1280. Because there are no genuine issues of material fact, the issue of limitations may be resolved on Plaintiff's Motion [#67]. *See Wolf*, 728 F.2d at 1306. Accordingly, Plaintiff's Motion [#67] is **granted** with respect to this issue.

## B.    Qualified Immunity

"The doctrine of qualified immunity shields government officials performing discretionary functions from liability for damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Boles v. Neet*, 486 F.3d 1177, 1180 (10th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is "immunity from suit rather than a mere defense to liability" and should therefore be resolved at the earliest stage of litigation. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Resolving the question of immunity involves a two-pronged test: (1) a court must decide whether the facts that a

plaintiff has shown make out a violation of a constitutional right and (2) a court must decide whether the right at issue was "clearly established" at the time of each defendant's alleged misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (holding that although a qualified immunity determination involves a two-part inquiry, the prongs may be reviewed in any order).

### 1.    Whether There Was a Constitutional Violation

The Eighth Amendment guarantees the right to be free from cruel and unusual punishment. U.S. CONST. amend. VIII. It prohibits failing to provide prisoners with proper and timely medical treatment. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (stating that because an inmate must rely on prison authorities to treat his medical needs, the government has an obligation under the Eighth Amendment to provide medical care for those whom it is punishing by incarceration because if it does not, those medical needs will not be met, potentially resulting in physical torture). In *Estelle*, the Court concluded that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment. *Id.* at 104 (citation omitted). Therefore, "deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Id.* at 105.

The test for deliberate indifference is both objective and subjective, in that a plaintiff must establish that: (1) he was deprived of a medical need that is, objectively, "sufficiently serious," and (2) that the defendant subjectively knew of and disregarded "an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994). With respect to the objective component, "the test is met if the harm suffered rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause' of

the Eighth Amendment." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).

Defendants do not contest the objective component of the two-part test. *Defs. Motion* [#64] at 10. They do, however, contest the subjective component. With respect to the subjective component, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Further, the "symptoms displayed are relevant . . . to the subjective component of the test: were the symptoms such that a prison employee knew the [specific] risk to the prisoner and chose (recklessly) to disregard it?" *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005). "Significantly, this level of intent can be demonstrated through circumstantial evidence." *Id.* at 752. "A factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. In this case, to prevail on its claims of Eighth Amendment violations, Plaintiff must prove that Defendants knew of and disregarded a substantial risk of death or serious injury.

Defendants contend that five Defendants—Chris R. Weldon ("Weldon"), Johnson, William Hunter ("Hunter"), Samuel Dean Martin ("Martin"), and Daniel Cano ("Cano")—did not sufficiently personally participate in the alleged constitutional violations to be liable under § 1983. *Defs. Motion* [#64] at 15-16. Personal participation is an essential element in civil rights actions. *Bennett v. Passic*, 545 F.2d 1260, 1262-1263 (10th Cir. 1976). Personal participation in violating a plaintiff's constitutional rights must be shown with respect to each defendant, and such participation must be more than mere vicarious liability for the actions of inferiors. *Ashcroft v. Iqbal*, 556 U.S. 556, 676 (2009). Generally speaking, "personal involvement is not limited solely to situations where a defendant

-15-

violates a plaintiff's rights by physically placing hands on him . . . [and] does not require direct participation because § 1983 states [that] any official who *causes* a citizen to be deprived of [his] constitutional rights can . . . be held liable." *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010) (internal citations omitted) (emphasis added). In addition to the causation element, in the context of Eighth Amendment violations for delay or denial of adequate medical care, each defendant must have a "culpable state of mind," i.e., have displayed deliberate indifference. *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

The Court notes at the outset of its analysis that the biggest issue raised in these cross-motions is whether Plaintiff has or can show that Defendants had a culpable state of mind—i.e., that they knew of and disregarded a substantial risk to Mr. Stieb's health or safety—during the events of August 16. The most glaring issue of fact raised in both parties' briefings is Mr. Stieb's heart condition and the medical cause of his death. Defendants argue that Mr. Stieb died of "an acute cardiac event," *not* a seizure. *Defs. Motion* [#64] at 11. Defendants argue that this precludes Plaintiff from showing the requisite subjective component of deliberate indifference because what transpired was not easily foreseen. *Id.* (stating that "Detention Center staff was not aware of facts from which the inference could be drawn that a substantial risk of serious harm existed due to Mr. Stieb's heart condition"). Plaintiff concedes that Mr. Stieb ultimately died of a cardiac event; however, Plaintiff maintains that the four seizures Mr. Stieb experienced on August 16, which Plaintiff contends should have been managed more appropriately by Defendants, led to his final cardiac event, and that after his cardiac event Defendants failed to timely respond to a clear medical emergency. *Pl. Motion* [#67] at 13; *Pl. Response* [#76] at 14.

Manifestly, this dispute about the cause of Mr. Stieb's death is a genuine issue of material fact. *See, e.g.*, *Estate of Booker v. Gomez*, 745 F.3d 405, 430-31 (10th Cir. 2014) (noting a genuine issue of material fact regarding the cause of an inmate's death, including whether a delay in medical attention caused the death). Nevertheless, the Court examines each Defendant's argument that he or she did not personally participate in any violation of Mr. Stieb's constitutional rights.

### a.    Defendant Weldon

First, Defendants argue that Captain Weldon was not at Work Release or the Detention Center at any time on August 16 and only became involved after Mr. Stieb's death. *Defs. Motion* [#64] at 15. The Court notes that the standard is not whether a defendant was physically present; rather, personal participation may be shown by a defendant who caused a constitutional violation. *See Dodds*, 614 F.3d at 1195. However, Plaintiff concedes that Defendant Weldon had no hand in the events that transpired and therefore did not personally participate in the actions giving rise to its claims. *Pl. Motion* [#67] at 18. Accordingly, Defendants' Motion [#64] is **granted** with respect to Defendant Weldon, and summary judgment is entered in his favor.

### b.    Defendant Johnson

Defendants argue that Nurse Johnson did not personally participate because "Ms. Johnson left the Detention Center at approximately 2:15 p.m. and was not present when Mr. Stieb suffered his cardiac event." *Defs. Motion* [#64] at 15 (citing *Deborah Anderson*[8] *8-16-14 Statement* [#65-13]). As noted above, however, whether Defendant Johnson was

---

[8]  The Court notes for clarification that Deborah Anderson and Deborah Johnson are the same person. As such, [#65-13] refers to a statement give by Defendant Johnson.

physically present is not the relevant inquiry. Rather, she may be held liable under § 1983 if she "*cause[d]* [Plaintiff] to be deprived of h[is] constitutional rights," *see Dodds*, 614 F.3d at 1195, with a "'culpable state of mind,'" *Farmer*, 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 297).

Mr. Stieb was returned by the hospital to the Detention Center with instructions to take an additional 300 mg of Dilantin. It is uncontroverted that *if* Defendant Nurse Johnson administered Dilantin to Mr. Stieb, she did not do so until after a third event, approximately four hours after Mr. Stieb had returned. Furthermore, Nurse Johnson knew at approximately 8:45 a.m. on August 16 that Mr. Stieb should have 300 mg of Dilantin upon his return based on information in the "nurse file." *Deborah Anderson 8-16-14 Statement* [#65-13] at 1. There is a genuine issue of material fact relating to whether this late administration or lack of administration of medicine led to Mr. Stieb's final cardiac event. Defendants' expert witness, Dr. Bruce L. Morgenstern, M.D. ("Morgenstern"), states in his December 5, 2017 report that "Mr. Stieb succumbed to a primary cardiac death, not an epileptic one." [#80-4] at 8. If it is true that Mr. Stieb's death did not result from a seizure, a reasonable jury may find that the late administration of Dilantin or lack thereof had no relationship to Mr. Stieb's death. However, the expert witness for Plaintiff, Dr. Mark Levin, M.D. ("Levin"), opines that "had Mr. Stieb's anti-seizure medications been continued upon entry and as recommended by the hospital at discharge, he would not have suffered a seizure and died." [#68-1] at 3. Thus, a factual issue remains as to whether Defendant Johnson sufficiently personally participated in the constitutional violations alleged.

The question remains whether Defendant Johnson was subjectively aware of the risk of death or serious injury to Mr. Stieb and recklessly ignored it when she delayed (or

-18-

denied) his access to Dilantin. Defendants' own expert witness explained in his report that "[p]atients with epilepsy have a significantly higher mortality rate than the general population. . . . [E]pilepsy-related causes of death account for approximately 40% of the mortality of epileptic patients . . . includ[ing] . . . sudden unexplained death in epilepsy" ("SUDEP"). [#65-20] at 5. A reasonable jury may find that the risk of death was "obvious" to Defendant Johnson, especially given her medical background. Accordingly, given that a material factual question remains, both Defendants' Motion [#64] and Plaintiff's Motion [#67] are **denied** on this issue.

c.    **Defendant Cano**

Plaintiff bases its Eighth Amendment claim against Defendant Cano solely on the disputed delay or denial of medication. *Pl. Response* [#76] at 8-10. Plaintiff asserts that Defendant Cano "violated [Mr.] Stieb's Eighth Amendment right to adequate medical care when [he was] provided notice of [Mr.] Stieb's medical condition and the doctors' instructions that [Mr. Stieb] needed Dilantin medication and repeatedly refused to provide the medication after his return from the emergency room." *Id.* at 8-9.

Plaintiff's contention relies heavily on a mischaracterization of Defendant Cano's Statement [#77-8]. It is not clear who at the Detention Center was informed that Mr. Stieb needed Dilantin or when such person or persons were informed. Defendant Cano's Statement merely says "I spoke with one of the female nurses but I do not recall her name, and she informed me that Justin was getting ready to be released from the hospital. I informed her that I would have someone go get him and she said OK and we ended the conversation and hung up." [#77-8] at 1. This encounter, as described by Defendant

Cano, is not the same as Defendant Cano "receiv[ing] notice that Justin needed to take Dilantin through a phone call from a hospital nurse at 6:40 am," as characterized by Plaintiff.  *Pl. Response* [#76] at 2.  While Defendant Cano's statement goes on to say that he "called dispatch to see if there was a patrol deputy available to go to the work release and pick up [Mr. Stieb's] medicine" at 11:00 a.m., it is not clear whether Defendant Cano did so in an attempt to comply with the hospital discharge papers or simply to comply with Mr. Stieb's typical regime after he experienced his third event at 10:30 a.m.  [#77-8] at 2. Defendant Johnson's statement also indicates that "[i]t was either deputy Cano or Hunter[9] that [sic] stated family was bringing in med[ication]s," but this, again, could have been in response to the 10:30 a.m. event.  *Deborah Anderson 8-16-14 Statement* [#65-13] at 1. Thus, there is an issue of fact regarding whether Defendant Cano personally participated in delaying or denying Mr. Stieb his medication.

The question remains, therefore, whether Defendant Cano was deliberately indifferent to a risk of serious injury or death to Mr. Stieb based on the delay or denial of his medication.  In other words, even if Defendant Cano knowingly delayed or denied Mr. Stieb his medication, can it be inferred from the evidence that he knew that doing so would subject Mr. Stieb to a risk of serious injury or death?

Seen from the point of view of Plaintiff, there is evidence that Defendant Cano knew the following: Mr. Stieb had endured two seizures the previous night, there were hospital orders to give Mr. Stieb additional medication (Dilantin) upon Mr. Stieb's return to the Detention Center (but Defendant Cano did not do so), and Mr. Stieb suffered another

---

[9] Plaintiff does not explicitly assert that Defendant Hunter had a hand in delaying or denying Mr. Stieb's medication.

seizure around 10:30 a.m.  However, there is also evidence that Defendant Cano made no effort to obtain the medication for Mr. Stieb until about 11:00 a.m.  This evidence could demonstrate deliberate indifference to a serious medical need, rather than inadvertent or negligent failure to provide medical care.  *See Ramos*, 639 F.2d at 575.

Seen from the point of view of Defendant Cano, Defendant Cano knew that Mr. Stieb had been deemed well enough for release from the hospital that morning, there is a lack of evidence regarding whether any sense of urgency was conveyed to Defendant Cano by hospital personnel, intake paperwork, or otherwise regarding the timing of the medication to be given to Mr. Stieb, it is unclear when Defendant Cano was notified about the medication Mr. Stieb was to be given, and Mr. Stieb's interactions with Defendant Cano upon his return to the Detention Center were normal.  This evidence could demonstrate inadvertent or negligent failure to provide medical care, rather than deliberate indifference to a serious medical need.  *See Ramos*, 639 F.2d at 575.

Given these opposing facts, a jury could find in favor of either party.  Accordingly, the Motions [#64, #67] are **denied** with respect to Defendant Cano.

### d.    Defendant Hunter

Defendants next claim that Defendant Hunter did not personally participate in the constitutional violations because "he left the Detention Center at 1:50 p.m. and was not present when Mr. Stieb suffered his cardiac event."  *Defs. Motion* [#64] at 15-16 (citing *W. Hunter 8-16-14 and 8-18-14 Jail Logs* [#65-14]).  While it is not dispositive that Defendant Hunter was not physically present at the time of Mr. Stieb's death, the Court agrees with Defendants that Plaintiff has not pointed to any evidence to show that Defendant Hunter

personally participated in any actions which caused Mr. Stieb's constitutional rights to be violated. Defendant Hunter witnessed Mr. Stieb's third event and timely requested Defendant Johnson's assistance. *See id.* at 2. Additionally, despite the fact that Defendant Johnson told Defendant Hunter the seizure "was fake," Defendant Hunter participated in the decision to place Mr. Stieb in the at-risk cell.

Defendant Johnson's asserted shortcomings aside, there is no evidence that Defendant Hunter could have or should have done more than summon the appropriate medical professional to care for Mr. Stieb. In *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006), the Tenth Circuit explained that it "recognized two types of conduct which may constitute deliberate indifference in a prison medical case: (1) a medical professional failing to treat a serious medical condition properly; and (2) a prison official preventing an inmate from receiving medical treatment or denying access to medical personnel capable of evaluating the inmate's condition." Defendant Hunter is a "prison official" who did *not* "prevent[ ] [Mr. Stieb] from receiving medical treatment or deny[ ] [him] access to [Defendant Johnson]," the appropriate medical personnel. *Id.* Further, Plaintiff implies that the decision to place Mr. Stieb in the at-risk cell is in itself indicative of deliberate indifference. The Court disagrees. Again, to prove deliberate indifference in this case, Plaintiff must prove that Defendants knew of and disregarded a substantial risk of seizure-related death or serious injury. Merely because the at-risk cell is where Mr. Stieb met his fate is not sufficient by itself to show that Defendant Hunter's decision to place him there constitutes deliberate indifference, especially with the abundant and uncontradicted testimony from jail staff that this was done for Mr. Stieb's safety. Finally, while there is evidence that Mr. Stieb was restless while Defendant Hunter was on duty monitoring him

until about 1:50 p.m., this again does not alone show that Defendant Hunter knew of and disregarded a substantial risk that Mr. Stieb might die or suffer other serious injury. *See Defs. Ex. DD, Dr. Morgenstern 12-5-17 Report* [#80-4] at 2 (summarizing video and noting that at 10:46 a.m., Mr. Stieb was fully conscious and threw a shoe toward the opposite wall; that at 10:47 a.m., he struggled to get off the cot; that at 10:53 a.m., he walked across the room in a "somewhat staggering fashion"; that at 11:09 a.m., he put on his shirt, rose from the cot, and waved to the camera; that at 12:23 p.m., he was pacing his cell and fell backwards against a wall; and that at 12:54 p.m., he appears to "read or study something" he was holding). Accordingly Defendants' Motion [#64] is **granted** with respect to Defendant Hunter because there is no evidence to show that he personally participated with the requisite deliberate indifference in the alleged constitutional violations at issue.

### e. Defendant Martin

Defendants maintain that Defendant Martin did not personally participate in the alleged constitutional violations because "[h]e was working in a different area of the Detention Center and was not present in the area of the at-risk cell when Mr. Stieb suffered his cardiac event." *Defs. Motion* [#64] at 16 (citing *Martin Statement* [#65-15]). Defendants greatly mischaracterize the evidence in order to support this contention. Defendant Martin directly admits in his statement that he periodically checked on Mr. Stieb while he was in the at-risk cell. *Martin Statement* [#65-15] at 3. Defendant Martin was still on duty at the time of Mr. Stieb's final event. *See* [#65-15] at 3. He states that he observed "around 15:25 . . . [that] Justin was lying on his side and belly but was moving his arm and leg around." *Id.* Defendant Martin then "left the control room." *Id.* At about 3:40 p.m., he

returned and states that he saw Mr. Stieb's arm "moving around." *Id.* At about 3:45 p.m., his shift ended and he left the jail. *Id.*

A video monitor partially recorded Mr. Stieb's cell activities around the time of his death, although there are a number of gaps in the video in the version provided to the Court. *See Pl. Ex. H, Surveillance Video* [#69]; *Pl. Ex LL, Video* [#79]. From its review of the cell video, the Court notes that at 3:27 p.m., Mr. Stieb rolled over and, by the end of that minute, appeared to start seizing or having some kind of a physical event. At 3:29 p.m., he was clearly seizing or having some event. The video then jumps from 3:29:56 p.m. to 3:50:22 p.m.; thus it is unclear what time Mr. Stieb stopped moving.[10]

The Court need not belabor the analysis for the events occurring after Mr. Stieb's cardiac event because there are clear issues of material fact from which a jury could find for either party. Seen from the point of view Defendants, Defendant Martin's failure to take action with respect to Mr. Stieb was, at worst, negligent, and seen from the point of view of Plaintiff, his inaction was, at worst, deliberately indifferent to a man in medical distress. The Court therefore finds that a material issue of fact remains with respect to Defendant Martin which must be resolved by the jury.

### f. Defendants Dominguez and Rivera

Defendant Rivera was on duty at the time of Mr. Stieb's final event. *See* [#65-17]

---

[10] Plaintiff notes that Defendant Weldon and Colorado Bureau of Investigations investigator Jack Haynes both report Mr. Stieb's final movements occurring at 3:29 p.m. *Pl. Motion* [#67] at 9 (citing *Pl. Ex. J, Supp. Expert Report by Warden Tim Gravette* [#68-9] at 2). The Court's attention is not directed to the evidence underlying these statements, but it is clear that neither of these persons directly witnessed Mr. Stieb's final moments. Their reports may state that Mr. Stieb's final movements occurred at 3:29 p.m. because this is the last moment of recorded cell video footage until the footage resumes at 3:50 p.m., at which time Mr. Stieb was no longer moving.

at 1, 3.  Defendant Dominguez did not witness the event and came on duty at 3:43:07 p.m. *See* [#77-6] at 13.  When the cell video resumes at 3:50 p.m. after about a 20-minute break, it shows two persons (Defendants Rivera and Dominguez) arriving.  They left the cell and then returned at 3:52 p.m.  They left again and returned at 3:54 p.m. with a Lifepak.  They did not perform chest compressions.  *See Pl. Ex. H, Surveillance Video* [#69]; *Pl. Ex LL, Video* [#79].

Defendants direct the Court's attention to evidence in statements provided by Defendants McNutt, Rivera, and Dominguez, *see Defs. Exs. P, Q, R, AAA, BBB* [#65-16, #65-17, #65-18, #85-1, #85-2], that at about 3:48 p.m., Defendants Rivera and Dominguez went to Mr. Stieb's cell to check on him but were unable to tell if he was breathing by looking through the window in the cell door.  They opened the door and spoke to Mr. Stieb, without response.  They exited the cell, reported a possible problem to the control room, grabbed gloves, and returned to the cell.  They could not find Mr. Stieb's pulse, so they left the cell again and requested that the control tower contact 9-1-1.  They returned to the cell again with a Lifepak machine to check his heart.  The Lifepak machine directed them not to administer a shock, but to begin chest compressions instead.  They left the cell without administering chest compressions, believing that Mr. Stieb was deceased.

Plaintiff directs the Court's attention to evidence in statements provided by Defendants Rivera and Dominguez, *see Defs. Exs. Q, R,* [#65-17, #65-18], that Defendant Dominguez arrived at work at 3:45 p.m. and was informed that Mr. Stieb was in an At-Risk Cell for medical observation since his return from the hospital that morning for suspected seizure activity.  Through the video monitor, Defendant Dominguez saw Mr. Stieb lying on the floor of his cell and went to check on him along with Defendant Rivera, who reported

having last seen Mr. Stieb move slightly at 3:40 p.m. Plaintiff correctly notes that the video does not clearly show that either deputy tried to locate a pulse or check Mr. Stieb's breathing, but instead simply rolled him over and left the room. *See Pl. Ex. H, Surveillance Video* [#69]; *Pl. Ex LL, Video* [#79]. Plaintiff provides evidence that the deputies were required to have training in and be certified in CPR and First Aid, and that custom and practice is to take control and respond appropriately when placed in the position of a first responder within a correctional setting. *Pl. Exs. I & J, Expert Reports by Warden Tim Gravette* [#68-8, #68-9]. Plaintiff faults Defendants Dominguez and Rivera for abandoning Mr. Stieb and failing to even attempt chest compressions as directed by the AED.

The Court need not belabor the analysis here because there are clear issues of material fact from which a jury could find for either party. Seen from the point of view Defendants Rivera and Dominguez, their actions were, at most, negligent, and seen from the point of view of Plaintiff, these actions were, at worst, deliberately indifferent. The Court therefore finds that a material issue of fact remains with respect to Defendants Dominguez and Rivera which must be resolved by the jury.

### g.    Defendant McNutt

Turning to Defendant McNutt, he began his shift at the jail at 1:33 p.m. *Pl.'s Ex. C, Delta County Jail Events Summary Report* [#68-3] at 9. At 3:45 p.m., Defendant Rivera handed the control console duties to Defendant McNutt. *Defs. Ex. Q, Riviera Written Statement* [#67-17] at 1. At 3:54 p.m., Defendant McNutt called 9-1-1 for an ambulance, and at 3:57 p.m., he called Defendant Weldon to notify him of the situation. *Pl.'s Ex. C, Delta County Jail Events Summary Report* [#68-3] at 11. At 4:03 p.m., Defendant McNutt noted that the ambulance arrived, and at 4:07 p.m., he recorded that the ambulance crew

informed him that Mr. Stieb had passed away. *Id.* at 11-12.

Plaintiff observes that Defendant McNutt was the supervisor on duty who had authority over Defendants Dominguez and Rivera,[11] that he was required to have training in and be certified in CPR and First Aid, and that he should have taken control of the situation by leaving Rivera in charge of the control panel duties and by responding himself to the situation with Mr. Stieb when it became clear to him that Defendants Dominguez and Rivera were (purportedly) not handling the situation in a timely and appropriate manner. *Pl. Exs. I, J* [#68-8, #68-9].

Again, the Court need not belabor the analysis here because there are clear issues of material fact from which a jury could find for either party. Seen from the point of view Defendant McNutt, his actions were at most negligent, and seen from the point of view of Plaintiff, Defendant McNutt's actions were, at worst, deliberately indifferent. The Court therefore finds that a material issue of fact remains with respect to Defendant McNutt which must be resolved by the jury.

### 2. Whether the Constitutional Right was Clearly Established

Because the Court finds that issues of material fact remain for the jury with respect to whether a constitutional violation was committed by Defendants Johnson, Cano, Martin, Dominguez, Rivera, and McNutt, the Court must determine whether, if such violations occurred, Plaintiff's constitutional right was clearly established at that time.

"Ordinarily, a plaintiff may show that a particular right was clearly established at the time of the challenged conduct by identifying an on-point Supreme Court or published

---

[11] The Court notes that the issue of qualified immunity for asserted supervisory responsibility is neither argued nor raised by the parties in the briefs.

Tenth Circuit decision; alternatively, the clearly established weight of authority from other courts must have found the law to be as he maintains." *A.M. v. Holmes*, 830 F.3d 1123, 1135 (10th Cir. 2016) (internal quotation marks and alterations omitted). "However, we do not always require case law on point, and the Supreme Court has warned that officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* (internal quotation marks and citations omitted). "We have therefore adopted a sliding scale to determine when law is clearly established." *Id.* "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Id.* at 1135-36. It is not necessary to show that "the very action in question has previously been held unlawful, [but] in the light of pre-existing law the unlawfulness must be apparent." *Id.* at 1136 (internal alterations and quotation marks omitted).

The Tenth Circuit Court of Appeals has stated that "there is little doubt that deliberate indifference to an inmate's serious medical need is a clearly established constitutional right . . . ." *Mata*, 427 F.3d at 749; *see, e.g.*, *Weatherford ex rel. Thompson v. Taylor*, 347 F. App'x 400, 404 (10th Cir. 2009) (concluding that a clearly established right was violated where the defendant jail "was aware of a substantial risk of harm to [the plaintiff-inmate] and that [the on-duty supervisor] opted, at least recklessly, to disregard that risk, taking no action on [the plaintiff's] behalf for several hours, and then, only after he collapsed); *Estate of Booker*, 745 F.3d at 434 (concluding the contours of the right are clearly established such that any reasonable officer in the [d]efendants' position (and with their training) would have known that failing to check [the plaintiff-inmate's] vital signs, perform CPR, or seek medical care for three minutes when he was limp and unconscious

. . . could violate the Constitution" (citing *McRaven v. Sanders*, 577 F.3d 974, 983 (8th Cir. 2009) (denying qualified immunity where the officer-defendant "made no attempt to resuscitate" the inmate "for seven minutes before paramedics arrive[d]"))). Accordingly, to the extent Defendants Dominguez, Rivera, McNutt, and Martin, seek qualified immunity, their request is **denied**.

With respect to Defendant Cano, the law is clearly established that deliberate delay or denial of required medication may violate a clearly established constitutional right. *See Ramos*, 639 F.2d at 575 ("Deliberate indifference to serious medical needs is shown when prison officials have prevented an inmate from receiving recommended treatment . . . ."); *Hunt v. Uphoff*, 199 F.3d 1220, 1223-24 (10th Cir.1999) (holding that prison officials who failed to provide insulin prescribed by a doctor were deliberately indifferent). Accordingly, to the extent Defendant Cano seeks qualified immunity, his request is **denied**.

With respect to Defendant Johnson, the Tenth Circuit has not explicitly decided whether qualified immunity is available "to employees of a private company providing medical services to inmates." *Kellum v. Mares*, 657 F. App'x 763, 768 n.3 (10th Cir. 2016). However, "the other circuits to [sic] have addressed this question have all found that qualified immunity is unavailable to employees of a private company providing such medical services." *Estate of Grubbs v. Weld Cty. Sheriff's Office*, No. 16-cv-00714-PAB-STV, 2017 WL 951149, at *5 (D. Colo. Mar. 8, 2017) (collecting cases). These decisions have declined to extend qualified immunity to private medical professionals because there is no history of affording qualified immunity to private medical providers, and because private competition addresses possible timidity on the part of private entities. *McCullum*

*v. Tepe*, 693 F.3d 696, 704 (6th Cir. 2012); *Jensen v. Lane County*, 222 F.3d 570, 578 (9th Cir. 2000); *Hinson v. Edmond*, 192 F.3d 1342, 1347 (11th Cir. 1999). Accordingly, the Court declines to extend qualified immunity to Defendant Johnson. *See Carmody v. Ensminger*, No. 16-cv-02603-PAB-NYW, 2017 WL 4150601, at *4 (D. Colo. Sept. 19, 2017).

### IV. Conclusion

IT IS HEREBY **ORDERED** that the Motions [#64, #67] are both **GRANTED in part and DENIED in part**. Defendants' Motion [#64] is **granted** to the extent that summary judgment is entered in favor of Defendant Weldon and Defendant Hunter. The Court **denies** the Motions [#64, #67] to the extent each party seeks entry of summary judgment with respect to Defendant Johnson, Defendant Cano, Defendant Martin, Defendant Dominguez, Defendant Rivera, and Defendant McNutt. Plaintiff's Motion [#67] is **granted** and Defendants' Motion [#64] is **denied** with respect to the statute of limitations issue.

Dated: August 29, 2018

BY THE COURT:

Kristen L. Mix
United States Magistrate Judge